Cite as 2022 Ark. App. 277

# ARKANSAS COURT OF APPEALS
DIVISIONS I & II
№ CV-21-265

| | |
|---|---|
| JAMES PARSONS ON BEHALF OF HIMSELF AND ALL OTHER SIMILARLY SITUATED TAXPAYERS<br><br>APPELLANT<br><br>V.<br><br>PREFERRED FAMILY HEALTHCARE, INC., A MISSOURI CORPORATION D/B/A/ HEALTH RESOURCES OF ARKANSAS; DECISION POINT; DAYSPRING BEHAVIORAL HEALTH SERVICES; AND WILBUR D. MILLS TREATMENT CENTER<br><br>APPELLEES | OPINION DELIVERED June 1, 2022<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-20-1302]<br><br>HONORABLE JOHN R. SCOTT, JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

James Parsons, on behalf of himself and all other similarly situated taxpayers, filed an illegal-exaction complaint against appellees Preferred Family Healthcare, Inc. (PFH), a Missouri Corporation d/b/a Health Resources of Arkansas; Decision Point; Dayspring Behavioral Health Services; and Wilbur D. Mills Treatment Center. The Benton County Circuit Court granted PFH's dismissal motion, and Parsons argues on appeal that the circuit court erred. We affirm.

I. *Applicable Caselaw*

There are three cases central to the issues raised by Parsons: *Prince v. Arkansas State Highway Commission*, 2019 Ark. 199, 576 S.W.3d 1; *Bowerman v. Takeda Pharmaceuticals USA*, 2014 Ark. 388, 442 S.W.3d 839; and *Nelson v. Berry Petroleum*, 242 Ark. 273, 413 S.W.2d 46 (1967). Parsons relies on *Nelson*, wherein the Arkansas Supreme Court reversed the lower court's dismissal of a complaint filed by an Arkansas citizen and taxpayer. *Nelson*, 242 Ark. at 274, 413 S.W.2d at 47. Nelson's complaint alleged that the defendant oil companies "have received unlawfully in excess of $3 million of taxpayers' money; that the grades and quantities of asphalt sold 'to the taxpayers of this state' have been of a lower grade and quantity than paid for." *Id*. The supreme court held that the complaint stated a cause of action and that "it appears to be an action instituted pursuant to Article XVI, Section 13, of the Constitution of the State of Arkansas." *Id*. at 276, 413 S.W.2d at 48. The court stated,

> This is a broad provision of our Constitution, and has been utilized in various types of actions. The case of *Starnes v. Sadler*, 237 Ark. 325, 372 S.W.2d 585 [(1963)], contains a comprehensive discussion of the meaning of the term, 'Illegal Exaction.' There, we said:
>
> > This Chancery Court action was instituted pursuant to Article XVI, Section 13, of the Constitution of the State of Arkansas, and the Chancery Court had jurisdiction of this Constitutional proceeding. This Constitutional provision is self-executing, and imposes no terms or conditions upon the right of the citizens there conferred. *Samples v. Grady*, 207 Ark. 724, 182 S.W.2d 875; 8 Ark. Law Review 129 (1954).
> >
> > "Illegal Exaction" under the Arkansas Constitution means both direct and indirect illegal exactions, thus comprehending any attempted invalid spending or expenditure by any government official, *Quinn v. Reed*, 130 Ark. 116, 197 S.W. 15; *Farrell v. Oliver*, 146 Ark. 599, 226 S.W. 529.

2

"Illegal Exaction" means far more than the mere collection of unlawfully levied taxes. With little limitation, almost any misuse or mishandling of public funds may be challenged by a taxpayer action. Even paying too much for cleaning public outhouses has been held by our courts as basis for a taxpayer's right to relief, *Dreyfus v. Boone*, 88 Ark. 353, 114 S.W. 718. Any arbitrary or unlawful action exacting taxes or tax revenues may be restrained and annulled by a taxpayer affected by such procedure, *Bush v. Echols*, 178 Ark. 507, 10 S.W.2d 906; *McClellan v. Stuckey*, 196 Ark. 816, 120 S.W.2d 155; *Park v. Hardin*, 203 Ark. 1135, 160 S.W.2d 501; *Brookfield v. Harahan Viaduct Improvement District*, 186 Ark. 599, 54 S.W.2d 689.

The remotest effect upon the taxpayer concerning any unlawful act by a tax supported program or institution may be enjoined under Article XVI, Section 13, of the Constitution of the State of Arkansas, *Green v. Jones*, 164 Ark. 118, 261 S.W. 43. . . .

Our Court thoroughly discussed 'illegal exaction' in the case of *Arkansas Association of County Judges v. Green*, 232 Ark. 438, 338 S.W.2d 672, wherein jurisdiction of the Chancery Court was questioned and illegal exaction was involved. This Court stated that the theory of an illegal exaction does not necessarily involve an illegal tax citing the case of *Lee County v. Robertson*, 66 Ark. 82, 48 S.W. 901, wherein the Court was not dealing with illegal tax, but with the question of illegal use or appropriation of county funds. . . . .

The case of *Arkansas County Judges Association v. Green* cited the case of *Ward v. Farrell*, 221 Ark. 636, 253 S.W.2d 353, wherein this Court stated concerning the involved Constitutional provision:

> There is eminent authority for holding, even in the absence of an express provision of the Constitution, such as referred to above, that a remedy is afforded in equity to taxpayers to prevent misapplication of public funds on the theory that the taxpayers are the equitable owners of public funds and that their liability to replenish the funds exhausted by the misapplication entitles them to relief against such misapplication.

*Nelson*, 242 Ark. at 276–78, 413 S.W.2d at 48–49.

PFH relies on *Bowerman*, *supra*, wherein the United States District Court, Western District of Louisiana, certified the following questions to the Arkansas Supreme Court: (1) whether article 16, section 13 of the Arkansas Constitution provided Bowerman with an illegal-exaction claim; and (2) whether *Nelson*, *supra*, is still good law. *Bowerman*, 2014 Ark. 388, at 1–2, 442 S.W.3d at 840. The supreme court stated, "We answer both questions in the negative." *Id.* at 2, 442 S.W.3d at 840. Bowerman claimed that the use of public funds for reimbursements for a prescription drug, Actos, and health-care costs associated with the drug's use gave rise to a public-funds illegal-exaction claim against the pharmaceutical company. *Id.* at 2–4, 442 S.W.3d at 840–41.

*Bowerman* states,

Article 16, section 13 of the Arkansas Constitution states that any citizen of any county, city, or town may institute suit, on behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever. An illegal exaction is defined as any exaction that either is not authorized by law or is contrary to law. *Carnegie Pub. Library of Eureka Springs v. Carroll Cnty.*, 2012 Ark. 128. Two types of illegal-exaction cases can arise under article 16, section 13: "public funds" cases, where the plaintiff contends that public funds generated from tax dollars are being misapplied or illegally spent, and "illegal tax" cases, where the plaintiff asserts that the tax itself is illegal. *Id.* Here, the question before us involves a "public funds" case, because Bowerman only asserts that public funds were used improperly. He does not assert that any of the taxes used to generate the public funds are illegal.

. . . .

. . . Before a public-funds type of illegal exaction will be allowed to proceed, there must be facts showing that monies generated from tax dollars or arising from taxation are being misapplied or illegally spent. Dockery v. Morgan, 2011 Ark. 94, 380 S.W.3d 377. Any arbitrary or unlawful action exacting taxes or tax revenues may be restrained and annulled by a taxpayer affected by such procedure. Nelson[, supra]. Therefore, in

4

order to state a claim for an illegal exaction, Bowerman must allege that the expenditure was illegal, misapplied, or arbitrary.

Bowerman does not assert that the action of the State in expending funds on Actos was unlawful. Nor can he, as the State is authorized by Arkansas Code Annotated section 19-5-306(10)(a)(viii) (Supp. 2013) to use State funds to pay for prescription drugs. Bowerman also does not allege that the funds were misapplied or arbitrarily spent. In fact, Bowerman does not allege any wrongdoing on the part of the State in expending these funds. All the wrongdoing that Bowerman alleges is on the part of the Respondents.

Even if Bowerman alleged wrongdoing in the use of state treasury funds, his allegations would not be sufficient to state a claim for illegal exaction. Actos was prescribed by physicians in the State of Arkansas, and certain amounts of the payments for these drugs were reimbursed by the State. Nothing in the Arkansas Code that indicates that the State could choose not to reimburse properly prescribed pharmaceuticals. Further, because the pharmaceuticals were prescribed by a physician, reimbursement for them cannot be said to be arbitrary. In *Nelson, supra,* the plaintiff alleged that the State overpaid for asphalt that was inferior to the grade of asphalt contracted by the State. Unlike *Nelson,* here the State paid reimbursement for exactly the drug that was prescribed. Thus, Bowerman's claim fails as a matter of law.

*Bowerman,* 2014 Ark. 388, at 4–6, 442 S.W.3d at 842–43. Further, the supreme court held that *Nelson* was inapplicable to the facts and circumstances of the case and declined to answer whether *Nelson* is still good law because it would be advisory to do so. *Id.* at 6–7, 442 S.W.3d at 843–44.

Finally, in *Prince, supra,* the Arkansas Supreme Court affirmed the dismissal of an illegal-exaction claim because there was an agreement between the Arkansas Highway Department and the United States Fish and Wildlife Services (USFWS). Part of the Department's agreement in obtaining an easement from USFWS for the expansion of Highway 79 was to demolish three bridges and restore the natural topography and reestablish

5

native hardwood vegetation. *Prince*, 2019 Ark. 199, at 1–2, 576 S.W.3d at 2. To comply, the Department planned to invite bids and enter into a contract with the winning bidder on the bridge-demolition project, with an estimated cost of $ 10.8 million. *Id.* Prince filed a preliminary-injunction motion and complaint for declaratory and injunctive relief alleging that the contract was void and constitutes a windfall to USFWS. *Id.* at 2, 576 S.W.3d at 2–3. Prince further alleged that because the contract was void, the monetary expenditures constitute an illegal action. *Id.* at 2, 576 S.W.3d at 3. The circuit court dismissed the complaint. *Id.* at 3, 576 S.W.3d at 3.

On appeal, the court held that Prince's complaint did not state a cause of action for an illegal exaction and stated,

> An illegal exaction is an exaction that is either not authorized by law or is contrary to law. *Stromwall v. Van Hoose*, 371 Ark. 267, 265 S.W.3d 93 (2007). Two types of illegal-exaction cases can arise under article 16, section 13: "public funds" cases, where the plaintiff contends that public funds generated from tax dollars are being misapplied or illegally spent, and "illegal-tax" cases, where the plaintiff asserts that the tax itself is illegal. *McGhee* [*v. Ark. State Bd. of Collection Agencies*], 360 Ark. 363, 201 S.W.3d 375 (2005). This court has stated that citizens have standing to bring a "public funds" case because they have a vested interest in ensuring that the tax money they have contributed to a state or local government treasury is lawfully spent. *Ghegan & Ghegan, Inc. v. Weiss*, 338 Ark. 9, 991 S.W.2d 536 (1999). Accordingly, "a misapplication by a public official of funds arising from taxation constitutes an exaction from the taxpayers and empowers any citizen to maintain a suit to prevent such misapplication of funds." *Farrell v. Oliver*, 146 Ark. 599, 602, 226 S.W. 529, 530 (1921). When the expenditure is authorized by statute, no illegal exaction occurs. *Sullins v. Cent. Ark. Water*, 2015 Ark. 29, 454 S.W.3d 727.

> A review of appellants' complaint reveals that it lacks sufficient facts to state a claim for an illegal exaction. Appellants do not allege in the complaint that the Department lacks the authority to enter into the agreement with USFWS. In fact, the Department has express statutory authority to "let all contracts for construction, improvement, and maintenance of roads comprising the state highway system." Ark.

6

Code Ann. § 27-65-107(a)(2) (Supp. 2017). It also has the express authority to "enter into all agreements with the United States government relating to the survey, construction, improvement, and maintenance of roads under the provisions of any present or future congressional enactment." Ark. Code Ann. § 27-65-107(a)(3)(A). Appellants also do not allege that the Department failed to follow any applicable statute, rule, or regulation with regard to the agreement.

The complaint does not allege any wrongdoing on the part of the state at all. Instead, it alleges that USFWS took advantage of the Department's highway-expansion project to force unreasonable terms on the state and attempts to assert various contract defenses on the state's behalf. This is not sufficient to establish a claim for an illegal exaction. *See Bowerman*[, *supra*] (holding that a claim that the state's treasury was diminished by reimbursements for a prescription medication alleged to have caused serious health problems was not one for illegal exaction where there was no claim that the state lacked authority to make the reimbursement payments and all allegations of wrongdoing were against the pharmaceutical company).

*Prince*, 2019 Ark. 199, at 5–6, 576 S.W.3d at 4.

## II. *Facts*

On June 1, 2020, Parsons filed a "public funds" illegal-exaction complaint against PFH. He described PFH as an Arkansas healthcare-service provider acting under various names and entities and alleged that "between 2010 and 2017, PFH received $52,810,672 in funds generated by Arkansas taxpayers which were distributed to it through the Department of Human Services (DHS) state Medicaid programs." Further, during the same time period, PFH received State funds through the State's General Improvement Fund (GIF). He claimed that a significant portion of the funds that PFH received from the State were acquired using unlawful means and were "utilized in a manner other than that represented by PFH."

7

In support of his allegations against PFH, Parsons attached and incorporated an affidavit of probable cause for the arrest warrant of Helen M. Balding.[1] Balding was PFH's billing director, and Parsons claimed that from March 1, 2013, to June 30, 2018, PFH engaged in a scheme to illegally bill the State of Arkansas Medicaid Program, which receives a portion of its money through taxes. The affidavit describes how Balding manipulated billing by entering false claims that were paid through Medicaid rather than Medicare.

Parsons alleged that PFH bribed Arkansas legislators to further its fraud scheme and attached and incorporated a federal indictment naming PFH officers and directors, Bonteia Bernadette Goss and Tommy Ray Goss, and Arkansas State Senator Jeremy Young Hutchinson.[2] Parsons asserted that the indictment described "efforts of PFH to bribe elected officials to not only impede any attempt to discover PFH's fraudulent actions, but also to steer taxpayer funds to PFH for which it would not have otherwise been entitled." Parsons alleged that the indictment

> describes PFH's bribery of Arkansas legislators Micah Neal and Jon Woods to obtain grants of taxpayer funds via the [GIF]. The [GIF], consisting of "excess" taxpayer dollars, operated as a slush fund for legislators, and PFH's legislators obtained funds in exchange for a cut of the proceeds.

---

[1]Exhibit 1, Affidavit for Warrant of Arrest, Potential Defendant: Helen M. Balding, Independence County District Court CR-2018-265-4 (Aug. 16, 2018).

[2]Exhibit 2, *United States v. Goss*, No. 19-03048-01/03-CR-S-BCW (W.D. Mo. June 13, 2019).

Parsons alleged that a federal plea agreement with Arkansas legislator Henry Wilkins IV is attached and incorporated in his complaint.[3] He claimed that the agreement "details PFH's bribery of Wilkins in exchange for him to act in his official capacity to steer taxpayer funds to PFH and its subsidiaries." Finally, Parsons attached and incorporated a plea agreement between the federal government and Milton Rusty Cranford, an employee of PFH and a registered lobbyist, "as further proof of PFH's bribes for legislative action by Arkansas legislators."[4]

Parsons alleged that

> [a]t all material times, both PFH and its bribed legislators took extensive steps to avoid detection of their scheme. These steps included, but are not limited to:
>
> a. Payments to Wilkins being directed to a church at which he was a pastor;
>
> b. PFH's filing of false certifications with federal and state authorities asserting that PFH had not engaged in prohibited lobbying activities;
>
> c. PFH's concealment of funds paid to its officers and directors by failing to file or filing false disclosures and returns with federal and state authorities;
>
> d. The payment of cash to Arkansas legislators which was not accounted for;
>
> e. The providing of gifts such as sporting event tickets to Arkansas legislators which was not accounted for.
>
> . . . .

---

[3]The complaint states that exhibit 3 is a plea agreement in *United States of America v. Henry Wilkins IV*, Case No. 4:18CR186, Eastern District of Arkansas. However, the record reflects that exhibit 3 is a copy of the plea agreement between the United States and Milton Russell Cranford.

[4]Exhibit 4 is a plea agreement in *United States v. Cranford*, No. 18-03020-01-CR-S-BCW (W.D. Mo. June 7, 2018).

The above-referenced acts of PFH, acting in concert with Arkansas legislators in their official capacities, constitute an illegal exaction of the funds of Arkansas taxpayers.

PFH moved to dismiss under Rule 12(b)(6) of the Arkansas Rules of Civil Procedure, arguing that Parsons's complaint fails to state an illegal-exaction claim because it does not assert any wrongdoing on the State's part because it does not allege any State expenditure that was illegal, misapplied, or arbitrary. *See Bowerman, supra.* PFH further argued that to the extent that Parsons seeks a refund of payments made under Medicare or Medicaid, the right and obligation to audit, review, and, if necessary, seek such refunds rests solely within the Arkansas Attorney General's (AG's) purview pursuant to the Medicaid Fraud False Claims Act. *See* Ark. Code Ann. §§ 20-77-901 et seq. (Repl. 2018 & Supp. 2021). It argued that a "public funds" illegal-exaction case against private entities and individuals is only viable in the event the AG or the Medicaid Inspector General fail to pursue civil- and administrative-enforcement actions against those engaged in fraud, abuse, or illegal or improper acts within the medical-assistance program.

PFH claimed that it and the AG had entered into settlement agreements resulting in PFH paying substantial sums as damages and in full and final settlement of all claims that could be brought by the State. Additionally, PFH would pay $400,000 in costs incurred during the investigation of the claims. A copy of the settlement agreement is attached to the dismissal motion. Further, PFH entered into a separate settlement agreement with the

federal government and the State that resolved all pending federal and state claims, and that agreement is attached to the motion.[5]

Parsons responded that PFH's attached exhibits converted the dismissal motion into one for summary judgment. Ark. R. Civ. P. 12(b). He argued that he had not had an opportunity to conduct discovery. For example, he noted that he had not discovered whether the amount reached in the settlement reflects the "full sum illegally exacted" by PFH. Accordingly, he argued that he is entitled to conduct discovery.

Parsons also argued that an illegal exaction occurs when the State does not receive "what is due." Parsons discussed *Nelson*, *Bowerman*, and *Prince* and claimed that even if he did not allege wrongdoing by the State, the question remains whether the State was deprived of that to which it was entitled. He argued that Nelson stands for the proposition that an illegal-exaction complaint can be sustained against a private party and that Bowerman and Prince did not overrule this point. He also argued that his complaint is replete with examples of misapplication of public funds by public officials

> from payments by the State for fraudulent Medicaid reimbursement claims of [PFH] facilitated by legislative action, to specific grants to [PFH] by individual legislators which were used as kickbacks to those legislators or which they knew [PFH] would use to enrich its officers and directors rather than for the purposes intended.

---

[5]The parties to the settlement agreement include United States of America, acting through the United States Attorney's Office for the Eastern District of Arkansas; the United States Department of Health and Human Services, Office of Inspector General; the United States Department of Veterans Affairs, Office of Inspector General; and the State of Arkansas, acting through the Arkansas Attorney General, Medicaid Fraud Control Unit.

Parsons argued that the state legislators' actions as set forth in his complaint can be considered state action. *See Leonards v. E.A. Martin Mach. Co.*, 321 Ark 239, 900 S.W.2d 546 (1995). And he argued that his complaint alleges multiple instances of wrongdoing by state actors, "thus state action." He pointed to the allegations regarding PFH's "acquisition of [GIF] through illegal means, namely the bribery of legislators." *See Wilson v. Walther*, 2017 Ark. 270, 527 S.W.3d 709 (holding in part that acts appropriating funds from GIF to planning and development districts facially violated legislative-appropriations provision of Arkansas Constitution). He also pointed to the allegations in his complaint regarding the allocation of GIF funds and the attached Cranford plea agreement describing the process used in legislating GIF allocations. Finally, he pointed to his complaint's allegations that certain legislators were involved in a scheme to combat DHS's ability to discover fraudulent Medicaid billings.

Parsons argued that his complaint and exhibits also allege a bribery scheme that resulted in Cranford's being paid $187,175 on the same date that the State deposited $1 million into a PFH account. He claimed, "Unless [PFH] is contending that the funds they obtained were requested on the basis that nearly $200,000 of it would be paid to Mr. Cranford, one of [PFH's] own directors, for his 'services,' this is an obvious misapplication of taxpayer funds." He recounted several more allegations as set forth in his complaint and claimed that there is ample evidence of the misapplication and illegally spent taxpayer funds through improper state action.

12

On February 1, 2021, a hearing was held on PFH's dismissal motion. PFH presented its argument for dismissal, asking the circuit court to ignore the exhibits it had attached to its motion as unnecessary for the court's determination. PFH admitted that its employees committed illegal acts for which they had been criminally charged, and in one instance, a guilty plea was entered. It claimed that those acts do not amount to an action by the State, which is required under *Bowerman*, *supra*. It argued that the fraudulent acts in regard to the Medicaid funds is analogous to a state employee stealing money. However, PFH claimed that the appropriation of those funds was proper. It argued that exhibit 1 to Parsons's complaint shows that the Office of Medicare Fraud has been actively involved in finding the illegal actions of PFH's former employees and that those people have been punished. In regard to the GIF, PFH argued that when a state expenditure is authorized by statute, no illegal exaction occurs. *See Sullins*, *supra*.

Parsons argued that under *Nelson*, *Bowerman*, and *Prince*, the question is whether the State has received what it is due. He claimed that *Nelson* was never overruled and that it does not require an allegation of wrongdoing by the State; rather, it requires that the State did not receive "what it contracted for." He argued that here, PFH billed the State for Medicare services; however, he claimed that the State did not receive what it paid for. He argued that PFH misbilled the services to Medicaid when it should have billed Medicare. He claimed that his complaint did not allege that the State did not receive services but that the State overpaid for those services. He asserted that the State's paying for Medicaid rather than

Medicare is a misapplication of funds and that the payment of moneys to legislators from the GIF was a misapplication if the money was used for something other than intended.

The circuit court granted PFH's dismissal motion, reasoning as follows:

> [Parsons's Counsel], I appreciate you explaining Exhibit 1 to your Complaint. I did understand that the affidavit demonstrated [PFH] did illegal billings. No argument that the State received the services it contracted for. The billings were merely excessive and, arguably, illegal.
>
> In Justice Danielson's concurrence in *Bowerman*, which Justice Corbin and Justice Hoofman joined, he argued that *Nelson* should be flat-out overruled. But stated some additional facts in *Nelson*. That concurrence says, "Nelson's theory was that the grades and quantities of asphalt sold to the taxpayers of Arkansas were of a lower grade and quantity than paid for by the highway department." I think that is a critical distinction.
>
> In this case, [PFH] did fraudulent billing. Services were of the grade and the quantity bargained for. Here, unlike in *Nelson*, or the allegation in *Nelson*, the State received what it bargained for. I think that is the distinguishing fact between *Nelson* and *Bowerman*, *Prince*. *Bowerman* and *Prince* clearly require that the State have done something wrong. It did not. The GIF process was followed correctly, what it was. There's no question that the appropriation was appropriate.

The circuit court's order dismisses Parsons's complaint, finding that he had failed to state a claim for relief because he did not assert any wrongdoing on the State's part and citing *Bowerman*, *supra*. The court expressly incorporated its oral ruling into the dismissal order. Parsons filed a timely notice of appeal, and this appeal followed.[6]

### III. *Standard of Review*

As stated in *Prince*,

---

[6]The circuit court's order reflected that Parsons had filed a previous illegal-exaction complaint, which was dismissed without prejudice. Accordingly, this second dismissal was with prejudice. Ark. R. Civ. P. 41(b) (2020).

14

In reviewing a trial court's decision on a motion to dismiss under Ark. R. Civ. P. 12(b)(6), we treat the facts alleged in the complaint as true and view them in the light most favorable to the party who filed the complaint. *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999). In testing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and pleadings are to be liberally construed. *Hames v. Cravens*, 332 Ark. 437, 442, 966 S.W.2d 244, 247 (1998). However, our rules require fact pleading. A complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. *Brown v. Tucker*, 330 Ark. 435, 438, 954 S.W.2d 262, 264 (1997); Ark. R. Civ. P. 8(a)(1) (2017).

*Prince*, 2019 Ark. 199, at 3–4, 576 S.W.3d 1, 3.

IV. *Argument*

First, Parsons argues that the circuit court failed to resolve all inferences in the complaint in his favor. He argues that instead, the court made factual findings that "[s]ervices were of the grade and the quantity bargained for," "the State received what it bargained for," and the State did not do anything wrong. The court found, "The GIF process was followed correctly," and that "[t]here's no question that the appropriation was appropriate." He argues that these findings are in conflict with the allegations in his complaint, which he contends must be accepted as true and given all reasonable inferences. He points to the specific allegations in his complaint regarding PFH's failure to use Medicare credentialed mental-health professionals and PFH's conspiring with two state legislators to disguise the fraudulent billing. He contends that it was a reasonable inference that the State was not getting its due "when [PFH] billed the state for services performed by people not qualified to bill for those services, and then legislators bribed by [PFH] pressured state regulators to modify their quality control program so the fraudulent billing remained undetected." He further points to his allegations that PFH bribed legislators to obtain grants via the GIF and claims that

15

examples of illegal state conduct pled include payment of bribes and delivery of state funds to PFH. He contends that all reasonable inferences would lead to the conclusion that if bribes are involved to obtain GIF funds, then the GIF process was not followed correctly.

Parsons contends that if the circuit court considered PFH's two exhibits, then the law on summary judgment would apply. *Heinrich v. Anders*, 2017 Ark. App. 413, 528 S.W.3d 277. Summary judgment should not be granted if a fact question remains. *Sisson v. Ragland*, 294 Ark. 629, 745 S.W.2d 620 (1988). He argues that if the court relied on information outside the complaint, it still resolved questions of fact, which is reversible error.

Second, Parsons argues that the circuit court erred in finding the facts alleged did not constitute an illegal exaction. He argues that his complaint establishes a cause of action under both *Nelson* and *Bowerman*. He contends that *Nelson* did not involve misconduct by the State and emphasizes that the supreme court recognized its role to determine if the facts pled were sufficient to overcome the dismissal motion. *Nelson*, 242 Ark. at 282–83, 413 S.W.2d at 51. He argues that *Nelson* is directly on point and stands for the proposition that when a taxpayer alleges that the State did not receive what it bargained for from a third party, then that allegation is sufficient to support a claim for illegal exaction against that third party. He contends that PFH deprived the State of what it paid for "by billing the state for medical services performed by people who were not qualified to bill for those services, just as the *Nelson* defendants were not providing the quality of asphalt the state contracted to receive." Parsons argues that PFH furthered this scheme by bribing legislators to conceal its actions

16

and that PFH obtained state money via the GIF program to bribe legislators and to pay for luxuries for PFH officers.

He claims that the circuit court misunderstood *Bowerman* as requiring wrongful state action for every illegal-exaction claim. He argues that had *Bowerman* held such, it would have overruled *Nelson* rather than distinguish it. He points out that the *Bowerman* court relied on the fact that the State had paid for the drug it received; thus, it received what it was due. *Bowerman*, 2014 Ark. 388, at 6, 442 S.W.3d at 843. Likewise, in *Prince*, the State received what it was due under the agreement with USFWS. *Prince*, 2019 Ark. 199, at 14 n.3, 576 S.W.3d at 8 n.3. He further argues that in *Bowerman*, the defendant could point to a valid law that authorized the State to purchase prescription drugs. *Bowerman*, 2014 Ark. 388, at 6, 442 S.W.3d at 843. He argues that here, there is no Arkansas statute that allows GIF money to be used for bribery of state officials or that allows PFH to fraudulently bill Medicaid for services. Accordingly, Parsons argues that the circuit court's ruling is contrary to the allegations in the complaint and should be reversed.

PFH acknowledges that when courts look outside the complaint to exhibits, arguments, or other supporting documents, the motion to dismiss shall be converted to one for summary judgment. *Barrows/Thompson, LLC v. HB Ven II, LP*, 2020 Ark. App. 208 599 S.W.3d 637. However, it contends that it argued below that the circuit court did not have to consider those exhibits and that the circuit court should ignore them. We agree that the circuit court considered Parsons's exhibit 1 "only as a means of determining" whether Parsons had stated a cause of action under Rule 12(b)(6). Exhibit 1 is an affidavit to obtain

17

an arrest warrant of a third party. In its ruling, the circuit court stated, "I did understand that [exhibit 1] demonstrated that the [third party] did illegal billings. No argument that the State [did not receive] services it contracted for. The billings were merely excessive and, arguably, illegal." The exhibit had been incorporated verbatim into the complaint, and the circuit court looked at it only at the urging of Parsons's counsel as the basis for the claim that the State had not received what it bargained for. Accordingly, the circuit court's dismissal was consistent with Rule 12(b)(6) and should be reviewed under an abuse-of-discretion standard.

We hold that the circuit court duly considered the complaint and properly determined that it failed to state a claim. Contrary to Parsons's argument, the circuit court is not to rubber stamp its approval of the nonmoving party's version of events. Instead, the circuit court must determine if the facts alleged are sufficient under the law to state a cause of action. *See, e.g., Ballard Grp., Inc. v. BP Lubricants USA, Inc.*, 2014 Ark. 276, 436 S.W.3d 445. Here, the circuit court found that the facts alleged did not establish wrongdoing by the State, which is required by controlling caselaw. *See Bowerman.* "It is axiomatic that, before a public-funds type of illegal-exaction case will be allowed to proceed, there must be facts showing that monies generated from tax dollars or arising from taxation are being misapplied or illegally spent." *McCafferty v. Oxford Am. Literary Project, Inc.*, 2016 Ark. 75 (2016) (citing *Dockery v. Morgan*, 2011 Ark. 94, 380 S.W. 3d 377); *see also Prince.*

PFH admits that its former employees committed criminal acts and claims that PFH willingly cooperated with the Arkansas Medicare Fraud Control Unit. It argues that a

corporation is not liable for its employees' criminal acts when those employees are not acting within the scope of their employment, i.e., when they are acting for their own personal interests. *See Sweeden v. Atkinson Imp. Co.*, 93 Ark. 397, 125 S.W.439 (1910); *Holt Bonding Co. v. First Fed. Bank of Ark.*, 82 Ark. App. 8, 110 S.W.3d 298 (2003). Here, the employees were acting for their own personal gain and enrichment as evidenced by the indictment details and guilty plea.

In his reply brief, Parsons argues that PFH's attempt to insulate itself from liability should be rejected because the PFH employees were top executives and directors. He argues that the entire PFH executive suite was engaged in the scheme to defraud taxpayers for PFH's benefit. He claims that there is nothing in the record to indicate that PFH objected to the actions of its "founders and officers." He contends that *Holt Bonding, supra*, ultimately held the company liable for funds that its employee embezzled. We note that the company was liable under the Uniform Commercial Code as an endorser on a returned check. *Holt*, 82 Ark. App. at 15, 100 S.W.3d at 303.

Parsons has correctly stated the law; on a motion to dismiss, the court considers the factual allegations to be true and views them in the light most favorable to the nonmoving party. *See, e.g.*, *Wiseman v. Batchelor*, 315 Ark. 85, 88, 864 S.W.2d 248, 249 (1993). If the complaint fails to allege a required element of the alleged cause of action, dismissal is entirely appropriate. In order to plea an illegal-exaction case, the complaint must sufficiently plead that the State either (1) lacked authority to act or (2) failed to follow the applicable statute(s).

*Prince*, 2019 Ark. 199 at 5-6. The circuit court found that the complaint failed to establish either of these requirements.

Reviewing the complaint, assuming all of the allegations are true and viewing it in the light most favorable to Parsons, there is no allegation that the State, itself, acted wrongfully. Further, after extended questioning regarding the relation of Parsons's exhibit 1 to several paragraphs within the complaint, the circuit court found that the State had "received what it bargained for." The court further pointed out that there was no specific allegation in the complaint that the State had not received what it bargained for, and it specifically ruled that the GIF appropriation was proper.

As argued by PFH, Parsons has misconstrued billing fraud for a failure to provide appropriate medical care. Although PFH's former employees fraudulently billed Medicaid instead of Medicare in order to personally pocket the difference, medical services were provided to citizens of the State. PFH claims that the fraud occurred because of deliberate billing errors—not because the medical providers were uncertified or unqualified to provide the services rendered. Parsons hinges his argument that the State did not receive what it bargained for on exhibit 1 to the complaint. But the fraud set out in exhibit 1 is that certain healthcare providers were not properly "credentialed" to deliver Medicare services or that they were not "registered." Any lack of "qualification" was only the technical approval by Medicare/Medicaid to bill—not a lack of medical qualification or experience. The facts as alleged in the complaint show only what PFH readily admits—that many people, including its former employees and state legislators, committed fraud against the State. Taking all of

20

the facts alleged in the complaint as entirely true, the State was not the wrongful actor, which is not sufficient to establish an illegal-exaction cause of action under *Bowerman*.

In his reply brief, Parsons contends that *Bowerman*'s holding does not rest on whether the fraud was committed by a third party. Instead, the claim failed because Bowerman could not establish an arbitrary, misapplied, or illegal expenditure because the State had authorized payment for prescription drugs by statute. *Bowerman*, 2014 Ark. 388, at 6, 442 S.W.3d at 843. Parsons claims that his complaint clearly alleges illegal and misapplied expenditures as the "State was not authorized to pay for services rendered by people unqualified to bill for them, nor was the State authorized to use GIF money to feather the nests of legislators who had the power to direct taxpayer funds."

Parsons further argues that the wrongdoing by state legislators acting in concert with PFH led to misapplication or the obtaining of State funds through illegal means. *See Leonards*, 321 Ark. at 246, 900 S.W.2d at 551 (defining state action for purposes of determining whether a deprivation of property in violation of due process occurred to include "the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.") (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Parsons argues that the state legislators' wrongdoing described in his complaint led to a misapplication or the obtaining of State funds through illegal means.

In *Prince*, the Arkansas Supreme Court affirmed that "citizens are constitutionally permitted to sue the state for an illegal exaction, but found that the complaint was properly dismissed because the plaintiffs had failed to plead sufficient facts upon which relief could be granted. *Prince*, 2019 Ark. 199, at 4, 576 S.W.3d at 3–4. There was no illegal exaction because USFWS "took advantage of the Department's highway-expansion project to force unreasonable terms on the state." *Id.* This was not sufficient to establish a claim for illegal exaction. *Id.*at 4–5, 576 S.W.3d at 4. Like the complaint in *Prince*, the complaint in this case does not sufficiently plead wrongful action by the State. The complaint pleads that many people committed multiple, wrongful, and criminal acts against the State through improper billing practices involving Arkansas Medicaid funds.

Further, even assuming that *Nelson* has not been de facto overturned by *Bowerman*, and *Prince*, Parsons failed to plead an illegal-exaction claim because the State received the mental-health care at the level contract. It was only after the fact, when those services were billed, that PFH's former employees committed fraud and committed other crimes to cover up that billing fraud. Accordingly, as in *Bowerman*, Arkansas patients received precisely the mental-health treatments prescribed by licensed medical personnel. Furthermore, the State is statutorily authorized to distribute public funds to pay for the medical care of its citizens who are enrolled in the Medicare and Medicaid programs. Ark. Code Ann. §§ 20-77-101 et seq. All of the moneys spent by the State, whether for Medicaid reimbursement or GIF grants, were appropriated by the legislature and were thus authorized by statute. "When the

expenditure is authorized by statute, no illegal-exaction occurs." *Prince*, 2019 Ark. 199, at 5, 576 S.W.3d at 4 (citing *Sullins*, *supra*).

Affirmed.

ABRAMSON, BARRETT, and KLAPPENBACH, JJ., agree.

MURPHY and BROWN, JJ., dissent.

**MIKE MURPHY, Judge, dissenting**. Today the majority holds that a scheme to deliberately overbill the State for mental-health services is not an illegal exaction. Further, the majority holds that state legislators acting under color of law to facilitate this scheme is not a "state action" for illegal-exaction purposes. I disagree that our constitution should be construed so narrowly. To maintain the power and authority granted to the taxpayers pursuant to our state constitution, reversal is necessary. Minimally, the complaint should have been considered sufficient to withstand a motion to dismiss.

The majority holds that *Bowerman v. Takeda Pharmaceuticals USA*, 2014 Ark. 388, 442 S.W.3d 839, is the controlling precedent. I would reverse, holding that *Bowerman* is distinguishable and that *Nelson v. Berry Petroleum*, 242 Ark. 273, 413 S.W.2d 46 (1967), is the more applicable case to these facts. I would further hold that Parsons did allege wrongdoing on behalf of the State.

PFH (1) intentionally overbilled the State and (2) billed for services provided by uncredentialed mental-health professionals. It illegally kept the excess payments, which is a misapplication of public funds. It defies logic that the circuit court found the services provided by PFH were of the "grade and quantity bargained for." The complaint clearly

states, "Limited Benefit QMBs must receive Medicare services by properly credentialed Medicare mental health professionals (MHPs). . . PFH did not use Medicare credentialed MHPs for all of their QMB clients." In other words, PFH billed for services provided by its employees who were not qualified to bill Medicare for the services. In *Bowerman*, the State got what it bargained for—the exact quantity and prescription requested. In *Nelson*, the State of Arkansas got ripped off by overpaying for what it received. This case is more like *Nelson*; the State was not authorized to overpay for services rendered by people unqualified to bill for them. The supreme court has not overruled *Nelson*, instead choosing to distinguish it in *Bowerman.* In fact, the supreme court was presented again with the opportunity in 2019, in *Prince v. Arkansas State Highway Commission*, 2019 Ark. 199, 576 S.W.3d 1, to overrule *Nelson* and, again, it chose to not do so.

Still, the complaint should survive regardless of whether *Nelson* applies because there is state action as contemplated in *Bowerman*. On the one hand, the majority and the trial court are correct: the General Improvement Fund (GIF) enabling legislation was passed by the legislature as a whole. At the time of the allegations herein, the legislation was presumed constitutional. (It has since been ruled unconstitutional.) The act of individual legislators directing state funds to particular entities is also contemplated by the law. It was agents of PFH—not the State—who committed the overbilling. On the other hand, the allegations in the complaint lay out a hybrid situation making it difficult to divorce the actions of PFH from the State. Even still, the "state action" allegations are that these legislators facilitated PFH's "exacting." Acting under color of law, legislators smoothed the way for PFH to avoid

24

oversight and procedural controls in order to continue its illegal scheme of overbilling. State funds were then kicked back or paid as bribes to these state actors.

That is a misapplication of public funds. That is contrary to law. That is an illegal exaction under our constitution and precedent.

The *Bowerman* court reasoned, "Bowerman does not assert that the action of the State in expending funds on Actos was unlawful . . . ." But in this case, it is alleged that the actions of the State were unlawful: taking a bribe to corruptly apply a statute for the benefit of a third party to the detriment of the taxpayers is contrary to the law. The overbilling by PFH was, as alleged in the complaint, facilitated in part by the State, through its agents, namely the state legislators. PFH offers no case law supporting that legislators, acting under color of law and using their positions to help PFH avoid detection of their scheme of overbilling, are not "state actors."

In *Bowerman*, the defendant could point to a valid law that authorized the state to purchase prescription drugs. There is no Arkansas statute that allows GIF money to be used for bribery of state officials or for PFH to bill the state for services performed by unqualified professionals. There is no Arkansas law that allows PFH to fraudulently bill Medicaid for services that would not be covered or covered at 20 percent of the reimbursement rate if billed correctly. In fact, we have law prohibiting those actions. Specifically, Arkansas Code Annotated section 19-11-107 (Supp. 2021) prohibits kickbacks; Arkansas Code Annotated section 21-8-304 (Supp. 2021) prohibits any public servant from obtaining any special privileges or exemptions as a result of his position; Arkansas Code Annotated section 21-8-

604 (Repl. 2016) requires lobbyists to report all gifts to a public servant; and Medicaid fraud is a criminal act pursuant to Arkansas Code Annotated section 5-5-111 (Repl. 2013).

The bottom line is that the complaint described wrongdoing by state legislators acting in concert with PFH. This led to a misapplication or the obtaining of state funds through illegal means. The two criteria for state action were satisfactorily pleaded by Parsons because (1) the legislators bribed by PFH enjoyed the privilege of being able to direct Arkansas taxpayers' funds individually via the GIF or via the intervention with state agencies by virtue of threats to propose or kill legislation that would have negatively affected those agencies; and (2) the state legislators were state actors because as constitutional officers, they were state officials receiving a state salary as provided by state statute. *See* Ark. Code Ann. § 10-2-201 (Repl. 2012).

The constitutional provision at issue is straightforward: "Any citizen of any county, city or town may institute suit on behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever." Ark. Const. art. 16, § 13. The plain language does not limit actions only against governmental entities. *Nelson* certainly does not. The determination of whether there is "illegal exaction" turns on the public nature of the funds wrongfully applied, not the public status of the wrongdoer. Taking the allegations as true, the case should have, at a minimum, survived the motion to dismiss.

*Bishop Law Firm*, by: *Matt Bishop*; and *Howerton Law Firm*, by: *Wendy R. Howerton*, for appellant.

26

*Matthews, Campbell, Rhoads, McClure & Thompson, P.A.*, by: *David R. Matthews* and *Sarah L. Waddoups*, for separate appellee Preferred Family Healthcare, Inc.